**No. 23-1727**

# In the United States Court of Appeals for the First Circuit

JOYCE TOTH,
*Plaintiff-Appellant,*

v.

EVERLY WELL, INC. and EVERLY HEALTH, INC.,
*Defendants-Appellees.*

On Appeal from the United States District Court
for the District of Massachusetts - Boston
Case No. 1:23-cv-11043-RGS (The Hon. Richard G. Stearns)

## BRIEF OF PLAINTIFF-APPELLANT

ANNA C. HAAC
GEMMA SEIDITA
KRISTEN G. SIMPLICIO
LEORA N. FRIEDMAN
TYCKO & ZAVAREEI LLP
2000 Pennsylvania Avenue NW,
Suite 1010
Washington, DC 20006
(202) 973-0900

ZACHARY ARBITMAN
ALAN M. FELDMAN
EDWARD S. GOLDIS
FELDMAN SHEPHERD
WOHLGELERNTER TANNER
WEINSTOCK & DODIG LLP
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
(215) 567-8300

JENNIFER D. BENNETT
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*

MATTHEW W.H. WESSLER
ROBERT D. FRIEDMAN
ALISA TIWARI
GUPTA WESSLER LLP
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741

December 28, 2023                    *Counsel for Plaintiff-Appellant*

**TABLE OF CONTENTS**

Table of authorities ...............................................................................................iii

Introduction.........................................................................................................1

Jurisdictional statement ........................................................................................5

Statement of the issues..........................................................................................5

Statement of the case............................................................................................6

    A.    Everlywell's "bogus" food sensitivity test ..............................................6

    B.    Everlywell's "terms and conditions" .....................................................9

    C.    This lawsuit ...................................................................................14

    D.    The district court's decision ..............................................................17

Standard of review..............................................................................................18

Summary of argument .........................................................................................18

Argument........................................................................................................... 22

    I.    Massachusetts law does not permit a company to extract
        contractual promises from consumers by threatening not to
        satisfy its existing obligations............................................................ 23

    II.    Everlywell failed to provide reasonable notice that it was
        binding Ms. Toth to wide-ranging contractual terms or to
        obtain meaningful assent to those terms. ........................................... 29

        A.    Everlywell did not provide reasonable notice to
            consumers that it was attempting to subject them to
            extensive contractual terms. ...................................................... 31

        B.    Everlywell failed to demonstrate that it secured
            meaningful assent. ................................................................... 37

    III.    Everlywell's right to unilaterally modify its terms rendered its
        contracts illusory. .............................................................................41

IV.    Everlywell's one-sided dispute resolution provisions are
       unconscionable. ...............................................................................43

       A.    Everlywell's non-negotiable arbitration clause, imposed
             on Ms. Toth only after she had already bought and
             opened her test, is procedurally unconscionable. .......................44

       B.    Everlywell's one-sided dispute resolution process is
             substantively unconscionable....................................................49

Conclusion....................................................................................................54

# TABLE OF AUTHORITIES

**Cases**

*A.Z. v. B.Z.*,
  725 N.E.2d 1051 (Mass. 2000)...................................................................... 25

*Alexander v. Anthony International L.P.*,
  341 F.3d 256 (3d Cir. 2003)........................................................................46

*Anthony's Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc*,
  489 N.E.2d 172 (Mass. 1986)...................................................................... 24

*Anthony's Pier Four, Inc. v. HBC Associates*,
  583 N.E.2d 806 (Mass. 1991) ...................................................................... 25

*Applebaum v. Lyft, Inc.*,
  263 F. Supp. 3d 454 (S.D.N.Y. 2017) ........................................... 34, 35, 37

*Ballou v. Asset Marketing Services, LLC*,
  46 F.4th 844 (8th Cir. 2022) .......................................................................30

*Baltazar Contractors, Inc. v. Town of Lunenburg*,
  843 N.E.2d 674 (Mass. App. Ct. 2006)...................................................... 25

*Berkson v. Gogo LLC*,
  97 F. Supp. 3d 359 (E.D.N.Y. 2015) ......................................................... 35

*Bernstein v. W.B. Manufacturing Co.*,
  131 N.E. 200 (Mass. 1921) .......................................................................... 42

*Boston Professional Hockey Association, Inc. v. Commissioner of Revenue*,
  820 N.E.2d 792 (Mass. 2005) ...................................................................... 23

*Burnett v. Pagliacci Pizza, Inc.*,
  470 P.3d 486 (Wash. 2020)..........................................................................54

*Circuit City Stores, Inc. v. Adams*,
  279 F.3d 889 (9th Cir. 2002)........................................................................46

*Coca-Cola Bottling Co. of Puerto Rico v. Negron Torres*,
  255 F.2d 149 (1st Cir. 1958) ........................................................................ 24

*Construction Associates, Inc. v. Fargo Water Equipment Co.*,
446 N.W.2d 237 (N.D. 1989)................................................................. 45

*Cordova v. World Financial Corp. of New Mexico*,
208 P.3d 901 (N.M. 2009)..................................................................... 53

*DeFontes v. Dell, Inc.*,
984 A.2d 1061 (R.I. 2009)..........................................................37, 39, 40

*Douglas v. Johnson Real Estate Investments, LLC*,
470 F. App'x 823 (11th Cir. 2012).......................................................... 42

*Ferguson v. Countrywide Credit Industries, Inc.*,
298 F.3d 778 (9th Cir. 2002) ................................................................. 53

*First Options of Chicago, Inc. v. Kaplan*,
514 U.S. 938 (1995).............................................................................22

*Frank J. Linhares Co. v. Reliance Insurance Co.*,
357 N.E.2d 313 (Mass. Ct. App. 1976) .................................................. 25

*Glassford v. BrickKicker*,
35 A.3d 1044 (Vt. 2011)......................................................................51

*Greenstein v. Flatley*,
474 N.E.2d 1130 (Mass. App. Ct. 1985) ................................................ 26

*H1 Lincoln, Inc. v. South Washington Street, LLC*,
179 N.E.3d 545 (Mass. 2022) ............................................................... 25

*Henshaw v. Robins*,
50 Mass. 83 (1845) .............................................................................. 24

*Howard v. Ferrellgas Partners, L.P.*,
748 F.3d 975 (10th Cir. 2014)..............................................................30

*In re Lloyd, Carr & Co.*,
617 F.2d 882 (1st Cir. 1980) ....................................................... 4, 23, 28

*Jackson v. Action for Boston Community Development, Inc.*,
525 N.E.2d 411 (Mass. 1988) ............................................................... 42

*Jackson v. Payday Financial, LLC*,
764 F.3d 765 (7th Cir. 2014) ................................................................ 47

iv

*James B. Nutter & Co. v. Estate of Murphy*,
  88 N.E.3d 1133 (2018) ...................................................................................18

*Katz v. Pershing, LLC*,
  672 F.3d 64 (1st Cir. 2012) ............................................................................22

*Kauders v. Uber Technologies, Inc.*,
  159 N.E.3d 1033 (Mass. 2021) ............................................................... *passim*

*Kaufman v. American Express Travel Related Services, Co.*,
  2008 WL 687224 (N.D. Ill. Mar. 7, 2008) ..........................................................40

*Klocek v. Gateway*,
  104 F. Supp. 2d 1332 (D. Kan. 2000) .................................................................30

*Lhotka v. Geographic Expeditions, Inc.*,
  104 Cal. Rptr. 3d 844 (Ct. App. 2010) ........................................................ 51, 54

*Lim v. TForce Logistics, LLC*,
  8 F.4th 992 (9th Cir. 2021) ............................................................................48

*McLearn v. Hill*,
  177 N.E. 617 (Mass. 1931) ............................................................................ 26

*National Federation of the Blind v. The Container Store, Inc.*,
  904 F.3d 70 (1st Cir. 2018)....................................................................... 22, 42

*Nino v. Jewelry Exchange, Inc.*,
  609 F.3d 191 (3d Cir. 2010)........................................................................44, 53

*Noble v. Samsung Electronics America, Inc*,
  682 F. App'x 113 (3d Cir. 2017)....................................................................... 34

*Norcia v. Samsung Telecommunications America, LLC*,
  845 F.3d 1279 (9th Cir. 2017) .........................................................................30

*Paul Arpin Van Lines, Inc. v. Universal Transportation Services, Inc.*,
  988 F.2d 288 (1st Cir. 1993) ........................................................................... 25

*Pearson v. John Hancock Mutual Life Insurance Co.*,
  979 F.2d 254 (1st Cir. 1992).......................................................................... 41, 42

*ProCD, Inc. v. Zeidenberg,*
　86 F.3d 1447 (7th Cir. 1996) ...................................................... 38

*Razor v. Hyundai Motor America,*
　854 N.E.2d 607 (Ill. 2006) ........................................................ 45

*Renovator's Supply, Inc. v. Sovereign Bank,*
　892 N.E.2d 777 (Mass. Ct. App. 2008)............................................ 26, 27

*Rodriguez-Rivera v. Allscripts Healthcare Solutions, Inc.,*
　43 F.4th 150 (1st Cir. 2022)....................................................18, 26, 29

*Rogers v. Dell Computer Corp.,*
　138 P.3d 826 (Okla. 2005)......................................................... 30

*Root v. Robinson,*
　2021 WL 102187 (E.D.N.C. Jan. 12, 2021) ....................................... 28

*Roth v. Ray-Stel's Hair Stylists, Inc.,*
　470 N.E.2d 137 (Mass. App. Ct. 1984)............................................ 24

*Skirchak v. Dynamics Research Corp.,*
　508 F.3d 49 (1st Cir. 2007).................................................. 43, 45, 46, 48

*Sloan v. Burrows,*
　258 N.E.2d 303 (Mass. 1970)...................................................... 23

*South Bay Boston Management v. Unite Here, Local 26,*
　587 F.3d 35 (1st Cir. 2009) ........................................................18

*Step-Saver Data Systems, Inc. v. Wyse Technology,*
　939 F.2d 91 (3d Cir. 1991) ......................................................... 29

*Stern v. Cingular Wireless Corp.,*
　453 F. Supp. 2d 1138 (C.D. Cal. 2006)............................................46

*Tillman v. Commercial Credit Loans, Inc.,*
　655 S.E.2d 362 (N.C. 2008) ........................................................ 54

*Vaks v. Ryan,*
　2014 Mass. App. Div. 37, 2014 WL 861455 (Dist. Ct. 2014)................................48, 52

*Waters v. Min Ltd.*,
  587 N.E.2d 231 (Mass. 1992) ............................................................ 46, 49

*Whittemore v. Thompson-Winchester Co.*,
  73 N.E.2d 475 (Mass. 1947) ................................................................ 24

*Zapatha v. Dairy Mart, Inc.*,
  408 N.E.2d 1370 (Mass. 1980) .......................................... 43, 44, 45, 49

**Statute**

Mass. Gen. Laws Ann. ch. 106, § 2-313 ................................................ 24

**Other Authorities**

15 Corbin on Contracts § 83.5 (2023) .................................................. 30

20 Williston on Contracts § 56:3 (4th ed.) ........................................... 45

American Arbitration Association, Commercial Arbitration Rules
  (Oct. 1, 2013) ..................................................................................... 12, 47

American Arbitration Association, Consumer Arbitration Rules, Cost
  of Arbitration (Nov. 1, 2020) ......................................................... 49, 50

John E. Murray, Jr.,
  *The Dubious Status of the Rolling Contract Formation Theory*, 50 Duq. L.
  Rev. 35 (2012) .................................................................................... 30

## INTRODUCTION

Everlywell has made hundreds of millions of dollars selling at-home health tests. One of its best sellers is its "Food Sensitivity Test," which purports to be a "physician-reviewed" test for "reactivity" to "common foods." Consumers plagued with ailments—and parents whose children suffer from such ailments—that may be caused by their diet pay over $100 for this test, on the belief that it will help them identify their food sensitivities. But what Everlywell knows, and these consumers don't, is that its test cannot possibly identify food sensitivities.

That's because, despite the test's name, it does not actually test food sensitivity; it tests whether you've recently eaten a particular food. So the foods that Everlywell reports as "high" reactivity are merely those that the test-taker has recently eaten, and those it reports as "normal" are those the test-taker has not recently eaten. But Everlywell does not tell consumers that. Everlywell tells consumers it is measuring their food sensitivity. And so consumers may cut out foods that are perfectly safe for them to eat or—perhaps worse—return to eating foods that they previously suspected they were allergic to.

Everlywell knows that its test does not do what it says. The medical community has resoundingly rejected it. Yet still Everlywell collects over a hundred dollars a test from people desperate to know what's making them or their kids sick. Unbeknownst to its customers, Everlywell collects something else too: the right to use and *sell* their

1

private medical information. After consumers have bought and opened their test, Everlywell directs them to register on its website to receive their results. And on that registration page is a small link behind which Everlywell has hidden nearly forty pages of contractual terms—including provisions purporting to authorize the company to share its customers' personal information with e-commerce service providers, use it in the company's own research, and sell it to other corporations. Consumers cannot register on Everlywell's website to get the test results they've already paid for without checking a box that Everlywell claims binds them to these contracts.

That's exactly what happened to the plaintiff in this case, Joyce Toth. She bought an Everlywell test, hoping to better understand her food sensitivities. Instead, she got results that made no sense—Everlywell reported a food that Ms. Toth knew she was allergic to as "normal" while suggesting she had a "sensitivity" to another food that she had eaten without incident the previous night. And because, like other consumers, Ms. Toth had registered on Everlywell's website as it directed her to do, Everlywell now purports to have bound her to contracts she never saw that give Everlywell the right to use her medical data in ways she never would have authorized.

Ms. Toth filed this lawsuit to challenge Everlywell's practices. In response, Everlywell moved to compel arbitration. The very same contracts that purport to

allow Everlywell to use Ms. Toth's private medical information also contain arbitration provisions. So by making Ms. Toth register to receive her test results, Everlywell argued, it had also procured her "agreement" to arbitrate. The day after Everlywell's motion was fully briefed, the district court granted it—with reasoning so minimal that the court was able to include its entire order in text on the docket itself.

But black-letter law bars Everlywell's attempt to compel Ms. Toth to arbitrate—several times over. The purported contracts Everlywell relies on do not satisfy any of the basic requirements to form a contract: notice, assent, and consideration. A reasonable consumer, directed by Everlywell to register on its website to receive test results that they had already bought, would not realize that Everlywell was attempting to bind them to pages upon pages of contractual terms. That alone is fatal. Under Massachusetts law, which everyone agrees applies here, a company seeking to bind a consumer to an online contract must at least provide reasonable notice of the type and scope of the contract.

Even if Ms. Toth had reasonable notice, she did not meaningfully assent. The Massachusetts Supreme Judicial Court has never authorized companies to impose new terms once a consumer has already purchased a product. And even assuming Massachusetts would adopt a "money now, terms later" theory of contract formation, that theory—as Everlywell has conceded—at the very least requires that

3

a consumer be able to reject the post-sale terms by returning the product for a full refund. Ms. Toth could not do so. That, too, defeats contract formation.

And Everlywell has contract-formation problems even beyond the lack of notice and assent. Its contracts also lack consideration. Below, Everlywell argued that its consideration was the test kit Ms. Toth purchased and its results. But, by the time Ms. Toth registered on Everlywell's website, she had already bought the test kit, and Everlywell was already obligated to provide her its results. It's well established that the performance of an existing obligation is not consideration for a new contract. Parties may not "us[e] the threat of nonperformance to extort greater compensation for doing only that which they were already obligated to do." *In re Lloyd, Carr & Co.*, 617 F.2d 882, 890 (1st Cir. 1980). Plus, any promise Everlywell might have made in its contracts was illusory: Everlywell maintained the right to unilaterally modify its terms at any time.

Any of these failures—notice, assent, or consideration—should have been enough, on its own, to defeat Everlywell's motion to compel arbitration. But even if Everlywell's contracts were validly formed, its arbitration provisions are still unenforceable because they are unconscionable. Not only did Everlywell bury its arbitration provisions in forty pages of fine print behind a hyperlink where no reasonable consumer would expect to find them, those provisions mandate a one-sided dispute resolution scheme in which consumers must pay thousands of dollars

4

and fly to Texas to arbitrate, with no hope of recovering anything more than the purchase price of their test.

Everlywell is not entitled to compel Ms. Toth to arbitrate her claims. This Court should reverse.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1332(d)(2) because this is a putative class action in which the amount in controversy exceeds $5,000,000, and at least one class member is a citizen of a different state than any defendant, JA16. This Court has jurisdiction under 28 U.S.C. § 1291 because this is an appeal of a final decision of the district court dismissing the complaint. The court granted Everlywell's motion to compel arbitration and dismissed the lawsuit on August 2, 2023. Add. 1; JA9. Ms. Toth timely appealed on August 30, 2023. JA161.

## STATEMENT OF THE ISSUES

**1.** Did the district court err in holding that, under Massachusetts law, Everlywell could extract contractual promises from Ms. Toth by threatening not to satisfy its pre-existing obligation to provide her the test results she had already paid for?

**2.** Did the district court err in holding that Everlywell demonstrated reasonable notice and meaningful assent under Massachusetts law even though the company failed to notify Ms. Toth that it sought to bind her to wide-ranging

contractual terms and neither informed Ms. Toth that she could reject those terms by returning its test nor provided her a way to do so?

**3.** Did the district court err in holding that Everlywell formed a valid contract with Ms. Toth under Massachusetts law, despite the fact that the company reserved the right to unilaterally modify its terms at any time?

**4.** Did the district court err in holding that Everlywell's arbitration provisions are not unconscionable, even though Everlywell imposed them only after Ms. Toth had purchased its test, buried them in pages of fine print, and packed them with one-sided terms that unreasonably favor Everlywell?

## STATEMENT OF THE CASE

### A.    Everlywell's "bogus" food sensitivity test

Just six years ago, Everlywell was a small start-up pitching celebrity investors on the reality television show *Shark Tank*. JA26. It is now worth more than a billion dollars. *Id.* Everlywell makes its money by selling at-home health diagnostic tests—tests that purport to assess anything from heart health to fertility to colon cancer. JA14–15; *see Shop our products*, https://www.everlywell.com/products (last visited December 21, 2023).[1]

---

[1] The defendants in this case are actually two affiliated corporations, Everly Well, Inc. and Everly Health, Inc. This brief refers to them together as Everlywell. In addition, unless otherwise specified, internal quotation marks, citations, emphases, brackets, and alterations are omitted from quotations throughout the

6

One of Everlywell's best-selling products is its "Food Sensitivity Test." JA15. Many people suffer unexplained ailments that may be attributable to their diet—rashes, for example, caused by a food they don't realize they're allergic to or migraines triggered by particular ingredients or gastrointestinal problems caused by intolerance of certain foods. *See* JA11. For these consumers, Everlywell's "Food Sensitivity Test" holds out the promise that they might finally learn what's causing their distress: The box claims that it's a "physician-reviewed" "food sensitivity test" that assesses "reactivity" to dozens of "common foods" that "may be causing discomfort." JA28–29, 129. And Everlywell aggressively markets it that way—seeking out people on Facebook, Twitter, and Instagram who might be suffering from food-related ailments. JA31. All you have to do, Everlywell suggests, is use its convenient kit to collect a blood sample at home, submit the sample to Everlywell, and await the results of a test that will finally identify the source of your problem. *See* JA28, 32, 149.

But Everlywell's test does not—and cannot—identify food sensitivities. That's because it measures immunoglobulin G, the "most common type of antibody found" in blood. JA11, 16–17. And immunoglobulin G has nothing to do with whether a person is sensitive to a particular food. JA17. It's produced when a person is *exposed* to a food, whether they're sensitive to it or not. JA17–22. Thus, a person's

---

brief. Finally, citations to Doc. are to the district court docket, to Add. are to the addendum, and to JA are to the joint appendix.

immunoglobulin G levels indicate whether they have eaten a particular food recently or regularly—not whether they have any "sensitivity" to it. JA 11, 17–18.

For this reason, the medical community has repeatedly condemned immunoglobulin G tests like Everlywell's that claim to measure food sensitivity. JA19. The American Academy of Allergy, Asthma and Immunology, the European Academy of Allergy and Clinical Immunology, the Canadian Society of Allergy and Clinical Immunology, the Australian Society of Clinical Immunology and Allergy, and the Allergy Society of South Africa have all warned that there is *no* scientific support for the claim that tests like Everlywell's measure food sensitivity. *Id.* The American Academy—which has over 7,000 allergists and immunologists as members—has labeled the tests a "myth." JA20. Johns Hopkins professor of medicine Robert Hamilton has declared them "bogus." JA25.

The reason the medical community is so alarmed is that these tests are not just worthless; they can be actively harmful. JA21, 23–24. Everlywell's test labels foods "high[ly]" reactive simply because they've been eaten recently; and it labels foods "normal" just because they have not. JA33. That "increase[s] the likelihood that consumers"—thinking they have a food intolerance they do not, in fact, have—"will introduce unnecessary dietary restrictions that could be harmful to their health." JA21. Worse, consumers who have been avoiding a food because they thought they were allergic to it, upon receiving test results telling them that their reactivity is

8

actually "normal," might reintroduce that food back into their diet, with "potentially deadly" results. *Id.*

These risks are particularly dangerous for children. Doctors have warned that parents buying these tests to determine what's making their child sick could end up eliminating important foods from their children's diet unnecessarily, causing "malnutrition." JA25. And, conversely, parents misled by the "false negatives" these tests produce may feed their children foods that "could lead to severe anaphylaxis." *Id.*

None of this, however, has stopped Everlywell from selling these tests—and reaping the profits. *See* JA15. The company charges consumers at least $100 or more per test kit. JA10. But that's not all that Everlywell gets: It gets the blood samples of hundreds of thousands, if not millions, of people. JA37. Everlywell claims the right to use its customers' personal information—including their medical data—for its own research, to rely on it to develop new products, to share it with other companies, and even to sell it. JA37–38. If Everlywell were to try to go out and purchase "a similar bank of information," the cost "would be enormous." JA 37.

## B. Everlywell's "terms and conditions"

Just as Everlywell does not tell consumers that its food sensitivity test does not actually identify food sensitivities, it does not warn consumers before they purchase its test that it plans to use—and potentially sell—their medical data. JA34. Instead,

9

the company includes contractual provisions purportedly authorizing it to do so amongst forty pages of other terms, all tucked behind a small-print link on a registration page that consumers don't see until after they've bought and opened the test. JA34, 73–112.

After consumers buy an Everlywell test and open the box, they find instructions directing them to register on Everlywell's website to receive their results—and warning them that "[t]he lab can only process your sample if you . . . register your kit." JA158. When they go to the website as directed, they are presented with a screen entitled "Create an Account," which asks them to input the basic contact information Everlywell would need to deliver their test results:

**Create an Account**

First Name

> First Name

Last Name

> Last Name

Email

> Email

Confirm Email

> Confirm Email

Password

> Password

Use 8 or more characters with a mix of letters, numbers & symbols. Your password should fill at least 6 bars

☐ I have read and accept the Terms and Conditions

Create My Account

Already have an account?  Log In

JA66. That screen also contains a checkbox, which says "I have read and accept the Terms and Conditions," which are hyperlinked. *Id.* A consumer cannot receive the

test results they have purchased without registering an account—and therefore clicking this checkbox. JA35.

Neither Everlywell's test instructions nor its registration page inform consumers that the linked terms and conditions govern anything other than their use of the company's website and their Everlywell account. JA66. And the first several pages of the terms do not suggest otherwise. They include provisions that, for example, describe Everlywell's "services" and "restrict[ ]" the use of Everlywell's site—by, *e.g.*, prohibiting users from uploading viruses to the site or attempting to gain access to its source code. JA73–75.

But these are not the only terms Everlywell has included. Behind the company's registration-page hyperlink are, in fact, four contracts totaling nearly forty pages of fine print. JA73–112. The link itself goes to a "User Agreement," which then links to three additional contracts entitled "Privacy Notice," "Consent for Services," and "Terms of Use." *Id.* After the first several pages of the User Agreement, the contractual provisions turn from describing Everlywell's services and the limitations on its website to waiving consumers' rights. JA77–79.

Everlywell's contracts purport to authorize the company to share consumers' personal information with e-commerce service providers, to use consumers' medical data for its own purposes, and to sell it in a "corporate transaction[ ]." JA89. They disclaim all warranties, including as to the "accuracy" or "reliability" of the

11

information Everlywell provides. JA77. And they require consumers to arbitrate any disputes. JA78, 101, 110.

The provisions that govern Everlywell's dispute resolution scheme are scattered throughout the contracts, including in three separate arbitration clauses. JA78, 101, 110. The first mention of arbitration comes at the end of the User Agreement—several pages in—under the heading "Dispute Resolution." JA78. That provision states that "any dispute, claim, question, or disagreement arising from or relating to this User Agreement or the purchase, registration, or use of any Everlywell product or Services" must be arbitrated under the "Commercial Arbitration Rules of the American Arbitration Association." JA78. The contract does not provide or link to a copy of AAA's commercial rules. *See* JA73–79. Nor does it mention that AAA requires that consumer disputes be governed by the organization's consumer rules, not its commercial rules. *See* American Arbitration Association, Commercial Arbitration Rules at 10 (Oct. 1, 2013).[2]

Numerous other provisions, spread among the four contracts, describe how the arbitration is to be conducted. It must take place in Everlywell's home state of Texas. JA78, 101, 110. The fees must be "shared equally by the parties," *id.*, but the consumer can only recover a maximum of either $100 or the cost of the product—there are conflicting provisions about whether it is the greater or the lesser of the

---

[2] The commercial rules can be found at https://perma.cc/9W7C-NGWV.

12

two. JA78 (greater); JA109 (lesser); *see also* JA77, 109 (prohibiting entirely consumers' recovery of any "consequential, incidental, indirect, exemplary, special or punitive damages"). The consumer must indemnify Everlywell for any claims "arising from or relating to" the use of its site, including the company's attorneys' fees. JA78, 110. Arbitration cannot be brought as a class action. JA79, 95, 102, 112. And the consumer must file any arbitration within a year of the dispute, regardless of ordinary statutes of limitations. JA79, 95, 102.

Most of these limitations—the damages limitation, the indemnification provision, the shortened statute of limitations—explicitly apply only to the consumer, not to Everlywell. *See, e.g.*, JA78–79. The contracts also contain an exception from arbitration for the claims Everlywell is most likely to bring—intellectual property claims—but they contain no similar exception for claims a consumer is likely to bring. JA95, 101, 110. In addition, Everlywell reserved the right to unilaterally "modify" its terms "at any time." JA 82; JA 105 ("We may revise and update these Terms of Use from time to time in our sole discretion."); JA 79 (Everlywell "may provide" users "with notices [] regarding changes to this User Agreement").

Everlywell does not disclose a single one of these provisions to consumers before they buy its test. JA34.

### C. This lawsuit

Plaintiff Joyce Toth is one of the many people who have bought a worthless Everlywell test. JA13, 37. Having lived with multiple allergies that limit what she's able to eat, she turned to Everlywell's Food Sensitivity Test to try to better understand her food sensitivities. JA13, 38–39. At $119.99, the price was steep, but she decided it was worth it and ordered a test from Target's website. JA13.

When the test arrived, Ms. Toth opened it and followed the instructions inside. JA39. They explained how to use the enclosed lancet to collect a blood sample and send it to Everlywell. JA155. They also instructed Ms. Toth to register on Everlywell's website to receive her results. JA 158. Ms. Toth did as she was told and awaited her results. JA39.

What she received was exactly what the medical community has warned against: a report that had no basis in the actual impact of Ms. Toth's diet on her wellbeing. For example, Everlywell indicated that Ms. Toth "had a sensitivity to eggs," even though she'd eaten eggs the night before without any problem. JA39. But it did not "flag" any sensitivity to shellfish or other foods that Ms. Toth knows she's allergic to and therefore avoids. *Id.* Although she didn't know it at the time, Ms. Toth's results followed predictably from the fact that an immunoglobulin G test can only measure whether a food has been recently eaten. Despite Everlywell's marketing

14

to the contrary, its test *couldn't* have told her what foods she is actually sensitive to. JA11, 17–18.

After learning that Everlywell's food sensitivity test reveals nothing about food sensitivity, Ms. Toth filed this lawsuit. She alleged that Everlywell deceptively markets its tests and misleads consumers into providing their personal medical information for Everlywell's commercial use. JA44–54. In response, Everlywell moved to compel arbitration. According to Everlywell, by registering on its website to receive her test results—at its direction—Ms. Toth became bound to the company's four contracts and their arbitration provisions. Doc. 29 at 10–13.

Ms. Toth opposed the motion. The parties agreed that Massachusetts law applies. *See* Doc. 29–1 at 11 n.3; Doc. 35 at 8. And under Massachusetts law, Ms. Toth argued, Everlywell had not validly formed contracts with her in the first place—and even if it had, its arbitration provisions were unconscionable. As an initial matter, Ms. Toth explained, Everlywell's contracts lack consideration. Doc. 35 at 14. That's because once she bought its test, Everlywell was obligated to provide her the results. *See id.* But the only consideration Everlywell identified for its post-sale contracts was its test results—that is, what the company was already obligated to provide. *Id.* It's basic contract law that companies cannot require consumers to assent to new contracts "in order to receive the benefit of their preexisting bargain." *Id.* at 15.

15

Next, Ms. Toth argued that Everlywell failed to comply with Massachusetts's basic requirements for online contract formation: that a company provide "reasonable notice" of contractual terms and obtain meaningful assent. *Id.* at 15–17 (citing *Kauders v. Uber Techs., Inc.*, 159 N.E.3d 1033, 1051 (Mass. 2021)). Ms. Toth explained that Everlywell had not provided sufficient notice, because reasonable consumers would not expect to sacrifice their legal rights with respect to a product they'd already purchased, simply by registering on the company's website—and Everlywell's site gave no indication to the contrary. *Id.* at 15. And Ms. Toth could not have validly assented to Everlywell's contracts because the company offered her no way to reject them. *Id.* at 16–17.

Third, Ms. Toth argued that Everlywell's ability to unilaterally modify its contract terms at any time "invalidates" them "entire[ly]." *Id.* at 23.

And, finally, Ms. Toth explained that Everlywell's arbitration provisions are both procedurally unconscionable—its non-negotiable terms were buried in fine print and disclosed only after purchase—and substantively unconscionable—its terms were "singularly one-sided," imposing (among other things) burdensome costs on consumers, requiring consumers but not Everlywell to bring their claims within a year, and mandating that consumers come to Everlywell's home state of Texas to arbitrate. *Id.* at 21–23.

16

### D.    The district court's decision

The district court granted Everlywell's motion to compel in a docket order the day after it was fully briefed. JA8–9. The court rejected Ms. Toth's consideration argument because in its view, until Ms. Toth actually provided Everlywell her blood sample, the company was free to require her to acquiesce to new contracts as a condition of running the test she already paid for. Add. 1–2. The court cited no authority for this proposition; nor did it explain how it could be reconciled with the longstanding principle that performance of a pre-existing obligation is not consideration. *See id.*

With respect to notice, the court held that a checkbox that says "I agree" to a company's terms automatically satisfies the requirement of reasonable notice— regardless of whether a consumer would expect those terms to contain the kinds of wide-ranging contractual provisions that Everlywell imposed here. Add. 2. And as to assent, the court concluded that Ms. Toth could have rejected Everlywell's contracts by returning the test kit for a refund. Add. 2. The court did not explain how she could do so given that she ordered her test from Target and had opened it by the time Everlywell attempted to impose its contracts on her. Everlywell's refund policy applies only to tests ordered from Everlywell, while Target's refund policy applies only to unopened products. JA75, 114, 146.

17

Lastly, the court held—without explanation—that Ms. Toth's procedural unconscionability arguments "fail for the same reasons" as her other arguments. Add. 2. It did not address substantive unconscionability. *See id.* Nor did it address Ms. Toth's unilateral modification argument. *See id.*

## STANDARD OF REVIEW

This Court "review[s] both the interpretation of arbitration agreements and orders compelling arbitration de novo." *S. Bay Bos. Mgmt. v. Unite Here, Local 26*, 587 F.3d 35, 42 (1st Cir. 2009). Where, as here, a district court's resolution of a motion to compel arbitration rests on the moving papers and supporting exhibits, "the record must be construed in the light most favorable to the non-moving party." *Rodriguez-Rivera v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 168–69, 169 n.17 (1st Cir. 2022). That means that this Court must "resolve factual disputes" and make "all reasonable inferences" in Ms. Toth's favor. *Id.* And where contractual language is ambiguous, it must be construed against the drafter, Everlywell. *See James B. Nutter & Co. v. Est. of Murphy*, 88 N.E.3d 1133, 1139 (Mass. 2018).

## SUMMARY OF ARGUMENT

As with any contractual term, a party seeking to enforce an arbitration clause must demonstrate that it did, in fact, form a contract—that is, that there was reasonable notice of the contract's terms, meaningful assent to those terms, and consideration. Everlywell can't satisfy a single one of these requirements. And even

if it could, its arbitration provisions are unconscionable. Its effort to compel Ms. Toth to arbitration, therefore, fails several times over.

**I.** The contracts Everlywell relies on lack consideration. The only consideration for Everlywell's many contracts, as the company admits, is the test kit Ms. Toth purchased and its results. But Ms. Toth had already purchased the test—and Everlywell was therefore already obligated to give her the results—when Everlywell attempted to impose its terms. It's well established under Massachusetts law that performance of an existing legal duty is not sufficient consideration for a new promise. Because the only consideration for Everlywell's post-purchase terms was the test results it was already obligated to provide, those contracts fail for lack of consideration.

In fact, Everlywell's attempt to extort contractual commitments from consumers by withholding their test results is not just a consideration problem; it violates Massachusetts law. The state's unfair trade practices statute has long prohibited companies from extracting contractual promises by refusing to perform an existing obligation unless they get new terms. And, if that weren't enough, the doctrine of equitable estoppel also bars Everlywell from leading consumers to believe that they are buying a product that will identify their food sensitivities and then, once they've already purchased the test, withholding their results until they agree to new contracts.

19

**II.** Even if Massachusetts law permitted parties to extract contractual promises by refusing to perform their pre-existing obligations, Everlywell failed to demonstrate that it satisfied the basic contract-formation requirements of providing reasonable notice to consumers and securing their assent. As to notice, the Massachusetts Supreme Judicial Court recently explained that reasonable consumers would not expect that registering on a company's website would subject them to the kind of wide-ranging contractual terms that Everlywell tried to impose here. Perhaps they might expect terms prohibiting misuse of the website, but they would not expect to be subject to a contract waiving important legal rights. And because consumers would not expect such a contract to accompany website registration, the court held that Massachusetts law requires that companies provide sufficient notice to enable a reasonable consumer to understand the nature and scope of the contract that the company is attempting to impose. Here, Everlywell did the opposite: It made every effort to ensure that consumers would not realize that the company was attempting to bind them to contracts that waived important legal rights.

As to assent, even assuming that contractual terms can ever be imposed after a consumer has purchased a product, there's no dispute that, at the very least, the consumer must have the right to reject those terms by returning the product for a full refund. That's because without the right to reject the terms, any supposed assent

20

is meaningless. Here, Ms. Toth could not reject Everlywell's terms by returning the test for a refund. That alone is dispositive.

**III.** Everlywell reserved the right to modify its contracts—including the arbitration provisions—at any time. Under Massachusetts law, that renders the contracts illusory: A contract that one party can change (or get out of) at any time lacks the mutuality required to constitute a binding contract.

**IV.** Finally, even if Everlywell's contracts were validly formed, its arbitration provisions are still unenforceable because they are unconscionable. The company waited until Ms. Toth had already purchased and opened its test to try to bind Ms. Toth to its contracts. It then buried the terms of its dispute resolution scheme in four separate contracts hidden behind a link that gave no indication that it contained the waiver of important rights. That's exactly the kind of unfair surprise that renders a contract procedurally unconscionable under Massachusetts law.

And, in addition to depriving Ms. Toth of any meaningful choice about whether to enter the contracts, Everlywell packed its dispute resolution scheme with one-sided terms: Its provisions ensure that it will cost consumers over $1,000 to arbitrate, but they can never get more than the cost of the product back in damages. In other words, arbitration under Everlywell's scheme will always result in the consumer losing money, even if they prevail on the merits. In addition, it requires consumers to arbitrate in Texas, Everlywell's home state; it severely limits the

damages consumers can receive, but imposes no such limitation on Everlywell; it limits the time within which consumers can bring claims, but does not impose the same limitation on itself; and it exempts the only claims Everlywell is likely to bring from arbitration entirely. This kind of egregiously one-sided scheme is not an attempt at legitimate dispute resolution; it's an attempt to prevent consumers from bringing claims at all. And it is substantively unconscionable under Massachusetts law.

## ARGUMENT

"[A]rbitration is a matter of contract." *Nat'l Fed'n of the Blind v. The Container Store, Inc.*, 904 F.3d 70, 80 (1st Cir. 2018). Whether the parties agreed to arbitrate—and whether any such agreement is enforceable—is therefore governed by ordinary "principles of state contract law." *Id.*; *see First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Under Massachusetts law, companies seeking to bind consumers to an online contract must provide "reasonable notice" and secure their assent. *Kauders v. Uber Techs., Inc.*, 159 N.E.3d 1033, 1049 (Mass. 2021). Contracts must also be supported by consideration. *See Katz v. Pershing, LLC*, 672 F.3d 64, 74 (1st Cir. 2012). Notice, assent, and consideration—Everlywell's contracts fail each of these basic requirements. And the arbitration provisions they contain are also unconscionable. As a matter of basic contract law, Everlywell cannot compel arbitration here.

**I.    Massachusetts law does not permit a company to extract contractual promises from consumers by threatening not to satisfy its existing obligations.**

Everlywell's attempt to impose contractual terms on Ms. Toth by refusing to provide her test results if she did not agree fails at the outset. Under Massachusetts law, promises extracted by refusing to perform a pre-existing duty are unenforceable.

**1.** It's well settled under Massachusetts law—and, for that matter, contract law across the country—that "performance of an existing legal duty . . . is not sufficient consideration for a new promise." *Sloan v. Burrows*, 258 N.E.2d 303, 305 (Mass. 1970); *accord Bos. Pro. Hockey Ass'n, Inc. v. Comm'r of Revenue*, 820 N.E.2d 792, 801 (Mass. 2005). The reason for this rule is to prevent parties from "using the threat of nonperformance to extort greater compensation for doing only that which they were already obligated to do." *In re Lloyd, Carr & Co.*, 617 F.2d 882, 890 (1st Cir. 1980). That's precisely what Everlywell did here.

The only consideration Everlywell has ever identified for *any* of the terms in the four lengthy contracts it claims to have imposed on Ms. Toth is the "testing kit[]" she purchased from Target and its results. Doc. 29-1 at 12. But Ms. Toth had *already* purchased the test when Everlywell mandated that she agree to new terms, including an arbitration clause. And that meant she was *already* entitled to the results: As Everlywell itself recognized below, by purchasing the test, Ms. Toth purchased both the test kit—i.e., the lancet to draw blood and the card to collect samples—and its

results. *See id.* at 18. After all, no consumer purchasing a $120 "Food Sensitivity Test" would believe they were just buying a very expensive needle. "[W]hat [Ms. Toth] paid for," Everlywell emphasized below, and what "the box said she would receive" was "test results." *Id.*

Everlywell has never disputed that, having marketed these results to consumers, it was obligated under Massachusetts law to provide them to those who purchased its test. And for good reason. Massachusetts has long held that a manufacturer must fulfill its promises about its products. *See, e.g.*, *Henshaw v. Robins*, 50 Mass. 83, 85–86 (1845); *Whittemore v. Thompson-Winchester Co.*, 73 N.E.2d 475, 476 (Mass. 1947); *Roth v. Ray-Stel's Hair Stylists, Inc.*, 470 N.E.2d 137, 138 (Mass. App. Ct. 1984) (description on box created express warranty that product would come with described features).[3]

Thus, by Everlywell's own account, the only "consideration" it provided for its many contractual terms, including its arbitration clause, was that it would perform

---

[3] *See also Coca-Cola Bottling Co. of Puerto Rico v. Negron Torres*, 255 F.2d 149, 152 (1st Cir. 1958) ("[T]he manufacturer ought to be held to strict accountability to any consumer who buys the product" based on "[t]he warranties made by the manufacturer in his advertisements and by the labels on his products."); *Anthony's Pier Four, Inc. v. Crandall Dry Dock Engineers, Inc*, 489 N.E.2d 172, 178 (Mass. 1986) (dock builder's representation that dock would come with a particular result— "permanently mooring the ship"—sufficient to create an express warranty); Mass. Gen. Laws Ann. ch. 106, § 2-313 ("Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.").

an obligation—providing test results—that it was already required to perform anyway. Under Massachusetts law, that's no consideration at all. For that reason alone, Everlywell's arbitration clause is unenforceable.

**2.** The principle that contracts may not be procured by threatening not to perform an existing obligation pervades Massachusetts law. The state's unfair trade practices statute, for example, bars parties from refusing to perform their existing obligations in an attempt "to extract additional benefits." *H1 Lincoln, Inc. v. S. Washington St., LLC*, 179 N.E.3d 545, 557 (Mass. 2022); *see, e.g.*, *Frank J. Linhares Co. v. Reliance Ins. Co.*, 357 N.E.2d 313, 318 (Mass. Ct. App. 1976) (holding that refusing to return the plaintiff's truck until it signed a release violated statute); *Anthony's Pier Four, Inc. v. HBC Assocs.*, 583 N.E.2d 806, 821 (Mass. 1991) ("[C]onduct in disregard of known contractual arrangements and intended to secure benefits for the breaching party constitutes an unfair act or practice."). Again, that's exactly what Everlywell did. Massachusetts courts would not enforce the terms that Everlywell extracted in violation of the law. *See, e.g.*, *Baltazar Contractors, Inc. v. Town of Lunenburg*, 843 N.E.2d 674, 678 (Mass. App. Ct. 2006); *Paul Arpin Van Lines, Inc. v. Universal Transp. Servs., Inc.*, 988 F.2d 288, 291 (1st Cir. 1993) (similar); *see also A.Z. v. B.Z.*, 725 N.E.2d 1051, 1058 (Mass. 2000) ("It is well-established that courts will not enforce contracts that violate public policy.").

Massachusetts courts have also repeatedly held that parties, like Everlywell, that use misleading representations or conduct to extract contract terms they otherwise would be unable to extract are equitably estopped from enforcing those terms. *See, e.g.*, *Renovator's Supply, Inc. v. Sovereign Bank*, 892 N.E.2d 777, 785–86 (Mass. Ct. App. 2008) (bank could not lead the plaintiff "to believe that the renewal of the line of credit under the same conditions was assured" only to hoist a less favorable deal on the plaintiff "three days after the expiration of the old line of credit"); *Greenstein v. Flatley*, 474 N.E.2d 1130, 1131, 1133 (Mass. App. Ct. 1985) (property owner could not make the plaintiff "conclude—reasonably—that [a] deal had been made" for a lease but "then disavow[] existence of such a lease one month before its scheduled commencement" to extract a less favorable lease from the plaintiff).

Estoppel is a longstanding equitable doctrine that bars parties from taking advantage of others by misleading them into doing something they wouldn't otherwise do. *See, e.g.*, *McLearn v. Hill*, 177 N.E. 617, 619 (Mass. 1931); *Renovator's Supply*, 892 N.E.2d at 784–85. It "functions to prevent one from benefiting from his own wrongdoing and to avoid injustice." *Renovator's Supply*, 892 N.E.2d at 784–85. "The essential elements of equitable estoppel are (1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; (2) an act or omission resulting from the representation, whether actual or by conduct, by the person to whom the

26

representation is made; and (3) detriment to the reliant person as a consequence of the act or omission." *Id.* at 785; *accord Sullivan v. Chief Just. for Admin. & Mgmt. of Trial Ct.*, 858 N.E. 699, 711 (Mass. 2006).

All three are easily satisfied here. As to the *first* element, again, Everlywell marketed a "Food Sensitivity Test" that it acknowledges entitles consumers to receive test results. It's no surprise, then, that in purchasing the test, that is what Ms. Toth believed she was buying: results. JA149. Everlywell then waited until Ms. Toth had already purchased the test, opened it, and went online at Everlywell's direction before springing contractual terms on her—terms that she could not reject if she wanted to receive the results she had already paid for. In other words, it misled Ms. Toth into believing that by paying for the test, she would receive her test results—no additional promises needed—to induce her to purchase the test. *See* JA149–50.

*Second*, based on Everlywell's misleading conduct, Ms. Toth purchased the test, which she would not have purchased had she known that Everlywell would then condition her results on an arbitration clause. JA150. And, *third*, as a result, Everlywell imposed an arbitration clause on her to which she would not have willingly agreed. *Id.* That's precisely the kind of unfair dealing the equitable estoppel doctrine was designed to prevent. *See, e.g., Renovator's Supply*, 892 N.E.2d at 784–85. Under Massachusetts law, Everlywell is estopped from trying to benefit from its unfair dealing—and, for that reason too, its arbitration clause is unenforceable. *See id.*

27

**3.** In allowing Everlywell to enforce the arbitration clause that it extracted by refusing to provide Ms. Toth's test results, the district court disregarded the well-settled Massachusetts-law principle that parties may not condition pre-existing obligations on new contractual terms. The district court reasoned that when Everlywell imposed its terms on Ms. Toth, it had not yet conducted her test, and it would not be able to do so until she had provided the company a blood sample. Add. 2. According to the district court, this meant that the company was free to condition those results on anything it wished. *Id.* In the district court's view, apparently, as long as a company has not yet performed its obligations, it may threaten not to do so unless the consumer acquiesces in additional contractual terms they would not otherwise agree to.

The court cited no authority for that proposition. Nor could it. There is no exception to Massachusetts's prohibition on relying on a preexisting duty to extort new contract terms for duties a company has yet to perform. The whole point of the pre-existing duty rule is to *prevent* parties who haven't yet performed their obligations from conditioning that performance on new promises they wouldn't otherwise be owed. *In re Lloyd, Carr & Co.*, 617 F.2d at 890. The arbitration clause—and other contractual terms—that Everlywell purportedly imposed on Ms. Toth in order to receive the test results she had already paid for is unenforceable. *See id.*; *cf. Root v. Robinson*, 2021 WL 102187, at *4 (E.D.N.C. Jan. 12, 2021) ("any purported contractual

28

terms" the defendant attempted to impose after the plaintiff had already purchased a ticket to a sweepstakes lacked consideration).

## II.     Everlywell failed to provide reasonable notice that it was binding Ms. Toth to wide-ranging contractual terms or to obtain meaningful assent to those terms.

Even if Massachusetts law permitted companies to extort consumers into entering contracts by threatening to withhold a product they'd already purchased, those contracts would still need to satisfy the basic contract-formation requirements of notice and assent. Under black-letter Massachusetts contract law, a company seeking to bind a consumer to a contract must show that it (1) provided the consumer with reasonable notice of the contractual terms and (2) secured meaningful assent from the consumer to be bound by those terms. *See Kauders*, 159 N.E.3d at 1049. The "burden of proof on both prongs" is on "the party seeking to enforce the contract." *Id.*; *see Rodriguez-Rivera v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 168 (1st Cir. 2022).

Everlywell failed to satisfy its burden on both counts. Indeed, Ms. Toth had already completed her purchase of its test kit before the company even tried to impose its additional contractual terms. She could not possibly have assented to those terms: Any contract based on that sale was already completed. *See Step-Saver Data Sys., Inc. v. Wyse Tech.*, 939 F.2d 91, 99 (3d Cir. 1991) (contract formed when parties agreed to product quantity and price).

Below, Everlywell argued that its contract was properly formed based on a "money now, terms later" theory of contract formation—that is, a theory in which companies may impose contracts on consumers even after they've already purchased the company's product. Doc. 39 at 3. But as many courts and scholars have pointed out, that theory disregards basic contract law, which requires that consumers have the opportunity to review the terms that govern the purchase of a product before they choose to buy it. *See, e.g.*, John E. Murray, Jr., *The Dubious Status of the Rolling Contract Formation Theory*, 50 Duq. L. Rev. 35, 37 (2012); 15 Corbin on Contracts § 83.5 (2023); *Ballou v. Asset Mktg. Servs., LLC*, 46 F.4th 844, 856 (8th Cir. 2022) (collecting cases); *Rogers v. Dell Comput. Corp.*, 138 P.3d 826, 832–33 (Okla. 2005); *Klocek v. Gateway*, 104 F.Supp.2d 1332, 1338–41 (D. Kan. 2000); *see also Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 982 (10th Cir. 2014) (Gorsuch, J.) ("[The] rolling contract formation theory may be about as controversial an idea as exists today in the staid world of contract law."). The Massachusetts Supreme Judicial Court has never accepted this dubious "terms later" theory of contract formation. *Cf. Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1290 (9th Cir. 2017) (refusing to adopt this theory in a case under California law when California had not yet taken a position on it).

But, as Everlywell conceded below, even assuming the validity of this theory, it still requires, at the very least, (1) reasonable notice of the contract terms and (2) an "express[ ] manifest[ation]" of assent to those terms coupled with the right to,

instead, reject the contract by returning the product for a refund. Doc. 39 at 3. Everlywell did not satisfy either of these requirements.

### A.   Everlywell did not provide reasonable notice to consumers that it was attempting to subject them to extensive contractual terms.

**1.** To determine whether a company has provided consumers reasonable notice of binding contractual terms, Massachusetts law requires courts to undertake a "fact-intensive inquiry" into the "totality of the circumstances." *Kauders*, 159 N.E.3d at 1049. Reasonable internet users are unlikely to believe that simply registering with a website will subject them to a binding contract with terms unrelated to the use of the site. *See id.* at 1049, 1051–52. So a company that seeks to bind consumers to extensive online contracts must provide reasonable notice of the nature and scope of those contracts. *See id.* In determining whether a company did so, Massachusetts law directs courts to consider not only the "form of the contract," but "the nature, including the size, of the transaction, whether the notice conveys the full scope of the terms and conditions, and the interface by which the terms are being communicated." *Id.* at 1049–50. Taking all these factors into account here, Everlywell did not come close to demonstrating that it provided consumers with reasonable notice that it was attempting to subject them to extensive contractual terms governing the test they had already purchased and waiving important legal rights.

Start with the "nature of the transaction." *Id.* at 1051. As the Massachusetts Supreme Judicial Court has explained, "registering" on an app or a website is "qualitatively different" from the kinds of transactions that an ordinary consumer is likely to think have a "contractual nature," such as "a large business deal where sophisticated parties hire legal counsel to review the fine print" or the "purchase or lease of an apartment or a car." *Id.* Although a consumer might recognize that in leasing an apartment, they are "enter[ing] into a contractual relationship," registering for a company's services online is "not obviously contractual." *Id.*

In *Kauders*, for example, the Massachusetts Supreme Judicial Court explained that a reasonable consumer registering to use Uber's app—which "connect[s] drivers and riders for future short-term, small-money transactions"—would not expect that doing so would subject them to "the type of extensive terms and conditions" Uber attempted to impose. *Id.* at 1051. Much like Everlywell's contracts here, Uber's contract included terms that indemnified Uber for riders' injuries, "subject[ed] riders' data to use by Uber for purposes besides transportation pick-up," and required arbitration. *Id.* Given the nature of the transaction—signing up for ride services—the Court concluded that it was "by no means obvious" that it would be accompanied by those kinds of contractual terms. *Id.* at 1051, 1054. And so the Court required that Uber demonstrate that its notice was sufficient to alert a reasonable

consumer, who otherwise would not expect that using a rideshare app would be governed by such "wide-ranging" terms. *Id.* at 1051, 1054.

So too here. Everlywell attempted to subject consumers to the same kind of "wide-ranging" contractual terms as Uber: terms that, for example, allowed Everlywell to use (and sell) their private medical information, required consumers to indemnify Everlywell, and mandated that they arbitrate disputes in Texas, rather than bringing them in court in their hometown. Consumers who purchase an Everlywell test are even less likely than Uber riders to expect that registering on Everlywell's site to receive the results of a test they already purchased would subject them to these kinds of wide-ranging contractual terms. At least Uber users are "signing up for future" services from Uber—that is, they know they are entering *some* kind of transaction. *Id.* at 1051. Everlywell customers are just trying to receive what they already bought. Whatever contractual terms a consumer might expect to govern a purchase like this one, they would not expect them to be imposed long after the purchase was already complete. Even more than in *Kauders*, then, it was essential for Everlywell to provide sufficient notice for reasonable consumers to understand that the company was using its innocuous-seeming registration to impose a contract that requires them to relinquish several important rights.

It did not do so. To the contrary, as in *Kauders*, the design of Everlywell's website "enables, if not encourages, users to ignore the terms and conditions." *Id.* at

33

1053. Consumers arrive at Everlywell's registration screen because they are told by the company to go there to register the test they've already purchased in order to receive their results. *See* JA158. And the registration screen asks them to do exactly that: provide their contact information to create an account on Everlywell's site to receive their results. "The reasonable inference for the reasonable consumer" is that the hyperlinked terms "relate[ ] only" to terms for using an account on Everlywell's site because that's what the consumer "had just" registered for—things like prohibiting consumers from circumventing copyright protections or explaining how to protect their account credentials. *See Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 467 (S.D.N.Y. 2017).

And, indeed, if a consumer clicked on the hyperlinked terms, that's precisely what they would have found: a description of Everlywell's services and terms prohibiting misuse of its website. The terms purporting to limit consumers' rights are buried after pages of innocuous terms. JA73–79. Everlywell's "interface" and the "form of [its] contract" thus obscures, rather than highlights, the company's attempt to extract binding contractual obligations. *Kauders*, 159 N.E.3d at 1049; *cf. Noble v. Samsung Elecs. Am., Inc.*, 682 F. App'x 113, 116 (3d Cir. 2017) ("[C]ontractual terms, including an arbitration clause, will only be binding when they are reasonably conspicuous, rather than proffered unfairly, or with a design to conceal or de-emphasize its provisions.").

34

Nowhere did Everlywell warn consumers that behind its innocuous-seeming link to terms that a consumer would assume merely governed the proper use of its website, "there were *contractual* terms for review, let alone *important* contract terms." *Applebaum*, 263 F. Supp. 3d at 468 (emphasis added); *see also Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 380 (E.D.N.Y. 2015) (explaining that merely linking to a website's terms fails to "clearly inform a user that she is subjecting herself to a one-sided contract that purports to modify her basic legal rights and remedies"). Instead, it misled consumers about "the full scope" of its terms and lulled them into registering without recognizing that the company was attempting to bind them to important contracts. *Kauders*, 159 N.E.3d at 1050.

As the Massachusetts Supreme Judicial Court made clear in *Kauders*, at a minimum, to provide reasonable notice to consumers who have no reason to expect contractual terms, a company must require that they actually "scroll through" the terms—or at least click on them. *Id.* at 1052 (explaining that failure to do so rendered notice unreasonable). Everlywell did not do so. JA35. By designing an interface that not only allowed consumers to register without reviewing its terms, but misled them into thinking they need not do so, Everlywell "has failed to show that it provided . . . reasonable notice." *Kauders*, 159 N.E.3d at 1054; *cf. id.* at 1052 (explaining that an interface failed to provide adequate notice because it allowed its riders to

35

"fully register for the service and click 'done' without ever clicking the link to the terms and conditions").

**2.** The district court held otherwise because it believed that, as long as a company requires consumers to check a box saying that they accept hyperlinked terms, it has satisfied its notice requirements—regardless of how far outside a reasonable consumer's expectations those terms may be. *See* Add. 2. But that's exactly the kind of reasoning the Massachusetts Supreme Judicial Court rejected in *Kauders*. The whole point of *Kauders* is that consumers' expectations matter. And a reasonable consumer would not expect that registering an account on a company's website would come with wide-ranging terms that waive important rights having nothing to do with using the site. *Kauders*, 159 N.E.3d at 1051, 1054.

Instead of applying the reasonable-notice section of *Kauders*, the district court placed dispositive weight on two lines plucked from a different part of the opinion dealing with assent—a separate, independent contract-formation requirement. Those lines state that one of the purposes of "requiring a user to expressly and affirmatively assent to the terms" is to put the user "on notice that" they are "entering into a contractual arrangement." Add. 2 (quoting *Kauders*, 159 N.E.3d at 1050).

But, again, the point of the notice requirements that *Kauders* imposes is that it is not enough that consumers know that they are agreeing to *some* kind of contractual arrangement; they must have reasonable notice of the "type" and "scope" of that

arrangement. *Kauders*, 159 N.E.3d at 1050–51; *see also Applebaum*, 263 F. Supp. 3d at 467–68 (explaining that by checking the box next to "I agree to Lyft's Terms of Services," a reasonable consumer "may have understood" that they "agreed to something," but because of the nature of the transaction, the design of the interface, and the company's failure to warn consumers that the terms contained important binding contractual promises, a reasonable consumer would not have understood they were agreeing to such promises—and therefore notice was insufficient).

Everlywell did not warn consumers that what appeared to be terms governing the use of its website were, in fact, "wide-ranging" post-sale contracts. *Id.* at 1051, 1054. Nor did it require consumers to scroll through its contracts before registering to ensure that they were adequately apprised of the serious contractual promises Everlywell sought to extract. *See id.* at 1052. The company, therefore, has not—and cannot—demonstrate that it reasonably notified consumers of its contracts.

## B. Everlywell failed to demonstrate that it secured meaningful assent.

Everlywell fares no better when it comes to assent. Because consumers had no ability to reject Everlywell's contracts, they could not meaningfully assent to them.

**1.** As Everlywell recognized below, even in jurisdictions that allow "money now, terms later" contract formation, the contract must "mak[e] clear" that the consumer can "reject the terms and conditions by returning the product" for a refund. *DeFontes v. Dell, Inc.*, 984 A.2d 1061, 1071 (R.I. 2009); *see e.g., ProCD, Inc. v.*

37

*Zeidenberg*, 86 F.3d 1447, 1451 (7th Cir. 1996) (emphasizing the importance of "a right to return the software for a refund if the terms are unacceptable"). Otherwise, any purported assent is meaningless.[4]

Nowhere does Everlywell's User Agreement—the document to which the company's account-registration page links—or any of its other contracts say that consumers may reject its contracts and receive a refund. *See generally* JA73–111. In concluding otherwise, the district court seems to have misread Everlywell's User Agreement. The court believed that the company's "Terms and Conditions explicitly state that users are free to turn down the terms of registration and receive a refund." Add. 2. In support of this assertion, the court cited page 3 of the User Agreement. But nothing on that page—or anywhere else in Everlywell's contracts—says that. Page 3 of the User Agreement says that a consumer that has requested a test through an Everlywell health consultant may cancel the request and receive a refund. JA75.[5] But it does not state that a consumer can reject Everlywell's contracts by canceling a requested test. And, in any event, Ms. Toth did not request her test from an Everlywell consultant; she bought it at Target.

---

[4] Of course, a company need not actually take the physical product back, so long as it makes clear to the consumer that they may reject the post-sale terms and receive a refund.

[5] Even this provision has limitations: If the test has shipped, Everlywell will withhold $15 from the refund, and it will not provide any refund at all on an order that's more than 30 days old. JA75.

The district court was simply wrong that Everlywell's contracts say that a consumer may reject them and receive a refund. They do not. For that reason alone, Everlywell cannot demonstrate assent. *See DeFontes*, 984 A.2d at 1073 (explaining that a return provision must "clearly explain[] to a reasonable consumer that his or her right to return the product includes rejection of the terms and conditions agreement").

The district court made a similar mistake in describing the refund policy on Everlywell's website. Contrary to the court's assertion (at Add. 2), Everlywell's general refund policy nowhere states that "users are free to turn down the terms of registration and receive a refund." It merely says that customers who have ordered a test kit through Everlywell may receive a refund under certain circumstances. JA114; *see also* Doc. 29-1 at 8 (Everlywell explaining that its refund policy applies to tests "purchased directly from Everlywell"). Again, Ms. Toth did not purchase her test kit from Everlywell. And even if Everlywell's refund policy were somehow applicable to tests purchased at Target, it would still be insufficient to demonstrate meaningful assent. The contract itself must tell consumers how to reject it; it is not enough for a company to have a general refund policy and leave consumers to guess whether they can reject the company's terms by seeking a refund. *See DeFontes*, 984 A.2d at 1073.

Blowing past what Everlywell's contracts actually say, the district court held that it doesn't matter because, under Target's refund policy, Ms. Toth could have

returned her test to Target. Add. 2. That's wrong twice over. *First*, again, the relevant question is not whether a consumer could have returned the product. It's whether a reasonable consumer would know that they can reject the contract by doing so. *See, e.g.*, *DeFontes*, 984 A.2d at 1073; *Kaufman v. Am. Exp. Travel Related Servs., Co.*, 2008 WL 687224, at *7 (N.D. Ill. Mar. 7, 2008) (explaining that in "both *ProCD* and *Hill*," the seminal cases accepting the money now, terms later theory, "the Seventh Circuit discussed the importance of a clear written opt out statement that advised the consumer to return the product if he or she did not agree to the terms").

*Second*, even if the ability to return a product were enough, Everlywell did not demonstrate that Ms. Toth had that ability. Target's refund policy states that "Most *unopened* items sold by Target in *new* condition and returned within 90 days will receive a refund or exchange." JA146 (emphasis added); *see id.* ("Items that are opened or damaged . . . may be denied a refund or exchange."). But like most consumers, Ms. Toth had already opened her test kit when she went to register it online. JA150 (explaining that Ms. Toth "opened the box and reviewed the instructions inside . . . which informed [her that she] would need to register"). Indeed, consumers like Ms. Toth confront Everlywell's terms precisely *because* they opened the box, and the instructions inside directed them to Everlywell's website for registration. JA156–58. They cannot then return their opened tests.

40

The district court's conclusion to the contrary is difficult to follow. The court cited what Everlywell said was a screenshot of Target's webpage for its Food Sensitivity Test from October 2022. Add. 2 (citing "Peaslee Decl., Ex. G," which is available at JA129–30); *see* JA115, 130. The "return details" at the bottom of that page say that the "item can be returned . . . within 90 days" of purchase. JA130. Although it is unclear, the court seemed to believe that this statement modified Target's general return policy and allowed consumers to return open test kits. *See* Add. 2 (stating that "an item webpage may modify the general return policy"). But that's not what the page says. To the contrary, it refers consumers to Target's full "return policy for complete information." JA130. A reasonable consumer reading this statement—or Target's return policy generally—would not conclude that they could return an open test kit to Target for a full refund, let alone that by doing so, they could reject the terms *Everlywell* was attempting to impose.

## III. Everlywell's right to unilaterally modify its terms rendered its contracts illusory.

Even if Everlywell had promised anything of value to Ms. Toth to impose its contracts on her, provided reasonable notice, and secured assent, any such promise was meaningless because Everlywell reserved the right to unilaterally modify its terms at any time. Under Massachusetts law, a unilateral modification clause, which permits one party to change—or get out of—a contract at will, renders the contract "illusory." *Pearson v. John Hancock Mut. Life Ins. Co.*, 979 F.2d 254, 258–59 (1st Cir. 1992);

41

*Jackson v. Action for Bos. Cmty. Dev., Inc.*, 525 N.E.2d 411, 415 (Mass. 1988) (explaining that "the right to modify unilaterally [the contract] tends to show that any 'offer' made by the defendant [] was illusory"). That's because a unilaterally modifiable contract "lack[s] the mutuality required to constitute a binding contract." *Pearson*, 979 F.2d at 258–59; *see also Bernstein v. W.B. Mfg. Co.*, 131 N.E. 200 (Mass. 1921) (explaining that, when one party remained free to exit the contract at any time, the agreement violated "the accepted legal maxim that . . . both of the mutual promises must be binding or neither will be").

Here, Everlywell's contracts repeatedly emphasize that the company has the right to unilaterally modify its terms—including its dispute resolution provisions—without ever acquiring assent to the modification. JA79, 82, 105. Because Everlywell could simply modify its contractual terms to avoid any obligation, Everlywell bound itself to nothing at all, and no contract was formed between Ms. Toth and the company. *See Jackson,* 525 N.E.2d at 415; *Douglas v. Johnson Real Est. Invs., LLC,* 470 F. App'x 823, 826 (11th Cir. 2012) (unilateral modification clause rendered arbitration contract "illusory" under Massachusetts law); *Nat'l Fed'n of the Blind*, 904 F.3d at 86 (similar reasoning under Texas law).

42

## IV. Everlywell's one-sided dispute resolution provisions are unconscionable.

Even if Everlywell's contracts were validly formed, its arbitration clause is unconscionable and therefore unenforceable.[6] "[T]here is no clear, all-purpose definition of unconscionable" under Massachusetts law, "nor could there be," so "unconscionability must be determined on a case by case basis." *Skirchak v. Dynamics Rsch. Corp.*, 508 F.3d 49, 59 (1st Cir. 2007); *Zapatha v. Dairy Mart, Inc.*, 408 N.E.2d 1370, 1376 (Mass. 1980). This determination "is made in the light of [the contract's] setting, purpose and effect." *Skirchak*, 708 F.3d at 59. A contract or contractual term is procedurally unconscionable if its "setting"—the way in which it was imposed— "could result in unfair surprise," *id.*, or reflects "an absence of meaningful choice on the part of one of the parties," *Zapatha*, 408 N.E.2d at 1377 n.13. And it is substantively unconscionable if its "purpose and effect"—that is, the challenged terms—are "oppressive," *Skirchak*, 508 F.3d at 59, or "unreasonably favorable to the other party." *Zapatha*, 408 N.E.2d at 1377 n.13.

Everlywell's arbitration clause is both procedurally and substantively unconscionable. The company buried the terms of its arbitration in four separate

---

[6] As explained above, Everlywell's contracts actually contain multiple arbitration clauses—as well as multiple, overlapping provisions governing how any arbitration will be conducted. For simplicity, in this section, unless otherwise specified, we use the phrase "arbitration clause" to refer to all of Everlywell's arbitration provisions.

contracts imposed on Ms. Toth only after she'd already purchased and opened its test. That is paradigmatic "unfair surprise." And it used those terms to stack the deck in its favor: It imposed an arbitration clause that, as a practical matter, would only ever apply to Ms. Toth's claims, not Everlywell's; requires Ms. Toth to travel across the country to Texas, Everlywell's home state, to conduct that arbitration; drastically shortens the statute of limitations for Ms. Toth to arbitrate her claims, but not for Everlywell; and—perhaps worst of all—prohibits Ms. Toth from recovering damages of more than $100, without limiting its own damages in any way, while simultaneously ensuring that it would cost Ms. Toth thousands of dollars to bring an arbitration in the first place. And, in case that wasn't enough, Everlywell reserved to itself alone the right to unilaterally modify the clause at any time. These egregiously one-sided terms make clear that Everlywell was "not seeking a bona fide mechanism for dispute resolution," but rather an "impermissible advantage." *Nino v. Jewelry Exch., Inc.*, 609 F.3d 191, 207 (3d Cir. 2010). That's quintessential substantive unconscionability.

### A. Everlywell's non-negotiable arbitration clause, imposed on Ms. Toth only after she had already bought and opened her test, is procedurally unconscionable.

In determining whether a contract evidences unfair surprise or a lack of meaningful choice, Massachusetts law directs courts to look at the "circumstances under which the agreement was entered into." *Zapatha*, 408 N.E.2d at 1377;

44

*see Skirchak*, 508 F.3d at 60. For example, were the challenged contract terms "obscurely worded" or "buried in fine print"? *Zapatha*, 408 N.E.2d at 1377. Was there an inability to meaningfully negotiate the terms "because of unequal bargaining power, as in an adhesion contract"? 20 Williston on Contracts § 56:3 (4th ed.) Did the timing of the contract undermine the ability to reject it? *See Skirchak*, 508 F.3d at 60.

The way in which Everlywell imposed its arbitration clause has virtually every hallmark of procedural unconscionability. That starts with its timing. As explained above, by springing the arbitration clause on Ms. Toth after she had already bought and opened the test, Everlywell unfairly surprised her and deprived her of any meaningful ability to reject the clause. Courts have repeatedly held that attempts to impose contractual terms under similar circumstances are procedurally unconscionable. *See, e.g.*, *Razor v. Hyundai Motor Am.*, 854 N.E.2d 607, 623 (Ill. 2006) (damages limitation was procedurally unconscionable, because it was "not made available to the plaintiff at or before the time she" bought her car); *Constr. Assocs., Inc. v. Fargo Water Equip. Co.*, 446 N.W.2d 237, 243 (N.D. 1989) ("Clearly an element of procedural unconscionability is present where J–M took advantage of its superior bargaining power to dictate terms through a pre-printed guide which was not provided . . . until long after the sales contract had been finalized."); *Stern v. Cingular*

45

*Wireless Corp.*, 453 F. Supp. 2d 1138, 1147 (C.D. Cal. 2006) (arbitration clause imposed after purchase was completed was procedurally unconscionable).

And, of course, Ms. Toth had no ability to negotiate the arbitration provisions once foist upon her. *Cf., e.g.*, *Cir. City Stores, Inc. v. Adams*, 279 F.3d 889, 893 (9th Cir. 2002) ("The [contract] is procedurally unconscionable because it is a contract of adhesion: a standard-form contract, drafted by the party with superior bargaining power, which relegates to the other party the option of either adhering to its terms without modification or rejecting the contract entirely."); *Alexander v. Anthony Int'l, L.P.*, 341 F.3d 256, 265 (3d Cir. 2003) (similar).

Everlywell's reliance on this unfair surprise to impose contractual terms that Ms. Toth would not have agreed to—and in consideration for which Everlywell provided only the test results it was already obligated to provide—"leads inevitably to the felt conclusion that knowing advantage was taken." *Waters v. Min Ltd.*, 587 N.E.2d 231, 233 (Mass. 1992).

The presentation of Everlywell's arbitration terms only exacerbates this unconscionability. The instructions in Everlywell's test box direct consumers to its website registration page to register for their test results, not to enter contracts with Everlywell. *See* JA155. The company then "burie[s]" its arbitration provisions in pages of "fine print" behind multiple hyperlinks. *Skirchak*, 508 F.3d at 60. As explained above, consumers would have to scroll through pages of text that appear merely to

describe Everlywell's services and to prohibit improper use of its website before reaching any indication that Everlywell sought to limit their rights. JA73–79. And they don't reach an arbitration clause until the second-to-last page. *See id.* In addition, the provisions defining how the arbitration will be conducted are scattered across numerous separate sections—"Dispute Resolution," "Limitation of Liability," "Indemnification," "Governing Law," "Preliminary Equitable Relief and Intellectual Property Claims," "Class Action Waiver," and "Changes to the Terms of Use"—of four different interconnecting documents. JA77–79, 101–102, 105, 109–11.

And even after reading all of those sections, it would be impossible for a consumer to know for certain which arbitral rules would govern any arbitration. Everlywell's terms say that the American Arbitration Association's Commercial Arbitration Rules apply. JA101. But a footnote on page 10 of those rules states that a "dispute arising out of a consumer arbitration agreement will be administered under the AAA's Consumer Arbitration Rules." American Arbitration Association, Commercial Arbitration Rules, (Oct. 1, 2013) https://perma.cc/9W7C-NGWV. Everlywell's contract does not resolve the inconsistency. Instead, it makes it impossible "for [consumers] to understand exactly what" rules would apply to arbitration, and therefore what "form of dispute resolution" Everlywell was attempting to impose. *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 778 (7th Cir. 2014).

47

This labyrinth of non-negotiable terms would be procedurally unconscionable, even if the company had presented it to Ms. Toth before she purchased the test. *See, e.g.*, *Vaks v. Ryan*, 2014 Mass. App. Div. 37, 2014 WL 861455, at *3 (Dist. Ct. 2014) ("Presented with a preprinted form to sign, the Vaks were given no meaningful choice . . . ."); *Skirchak*, 508 F.3d at 60–61 (terms "hidden in two paragraphs in a multi-page appendix to a fifteen-page document" constitute evidence of procedural unconscionability); *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 1001 (9th Cir. 2021) (clause presented "in the middle of 31 numbered paragraphs, within more than nine pages of single-spaced, 10-point font" was procedurally unconscionable). Everlywell's decision to wait until Ms. Toth had already bought and opened the test only heightened the "unfair surprise" and further deprived her of "meaningful choice."

The only explanation the district court offered for rejecting Ms. Toth's procedural-unconscionability argument was that it "fail[s] for the same reasons" as Ms. Toth's other arguments. Add. 2. But, as explained above, those arguments do not fail. And, in any event, non-negotiable, difficult-to-understand contract terms buried in pages of fine print, imposed after a consumer has already purchased a product on threat of withholding what the consumer purchased are procedurally unconscionable regardless of whether the contract satisfied the basic elements of

48

offer, acceptance, and consideration. *See supra* pages 44–47. Everlywell's arbitration provisions fit that bill.

### B.    Everlywell's one-sided dispute resolution process is substantively unconscionable.

As with procedural unconscionability, there are no rigid requirements for substantive unconscionability under Massachusetts law. The question is simply whether, under the circumstances, the "sum total of [the] provisions drives too hard a bargain." *Waters*, 587 N.E.2d at 233. In answering that question, courts look to whether the terms are "unreasonably favorable" to the drafting party. *Zapatha*, 408 N.E.2d at 1377 n.13. Here, Everlywell's arbitration provisions are not only "unreasonably favorable" to the company, they are egregiously so.[7]

**1.** Everlywell's arbitration provisions guarantee that even a consumer who *prevails* in arbitration will end up losing well over $1,000 in the process. Start with the cost of the arbitration: Even assuming that the American Arbitration Association's Consumer Arbitration Rules apply here—rather than the more costly Commercial Rules required by Everlywell's arbitration clause—the minimum total cost of the most basic arbitration under those rules is $3,400. *See* American Arbitration Association, Consumer Arbitration Rules, Cost of Arbitration ("AAA Consumer Rates") at 1 (Nov. 1, 2020); *see also* Doc. 39 at 7 & n.2 (Everlywell arguing that the

---

[7] Because it incorrectly waved off Ms. Toth's procedural unconscionability arguments, the district court did not consider substantive unconscionability.

consumer rules would apply).[8] That cost allows the parties to submit no more than 100 pages of documents total—in the entire arbitration—and covers no more than 7 hours of an arbitrator's time from start to finish; it does not include even a single hearing. AAA Consumer Rates, at 1.

This no-hearing, almost-no-documents, less-than-one-day arbitration is plainly insufficient for the fraud claims alleged in this case. Ms. Toth's complaint alone would take up nearly half the document limit. But to review documents in excess of the 100-page or 7-hour limit costs $300 per hour. *Id.* A hearing costs $500, plus $2,500 per day to compensate the arbitrator. *Id.* So the $3,400 minimum is just the starting point.

In recognition of the deterrent effect of these costs on consumer claims, which can be brought in court for much less money—and the unequal financial position of companies that mandate consumer arbitration and their customers—the American Arbitration Association requires that the consumer pay only $200 of these costs, allocating the remainder to the business. *See id.* The purpose of this allocation is to ensure that arbitration is used as an alternative to court, not to prevent consumers from bringing claims at all.

But Everlywell's contract mandates otherwise. It provides that "[t]he fees charged by the [American Arbitration Association] and arbitrator shall be shared

---

[8] The fee schedule is available at https://perma.cc/9DNV-2WR5.

equally by the parties." JA78. That means that even for the barebones arbitration where Ms. Toth would not even get a hearing she'd be required to pay $1,700. To get the dispute resolution this case requires, it would cost much more.

And not only do Everlywell's contracts override the American Arbitration Association's consumer cost protections, they also severely limit the damages consumers may receive in arbitration. Everlywell prohibits consumers from recovering more than $100 or the price they paid for the product. JA78 (stating that consumer can recover the greater of the two); JA109 (stating consumer can recover the lesser of the two). Thus, Everlywell designed its arbitration scheme so that Ms. Toth could recover a maximum of $119.99—the amount she paid for her test—but would have to pay a minimum of $1,700. In other words, it designed a scheme where a consumer will *always* lose money. It's difficult to imagine a dispute resolution method that could be more "unreasonably favorable" to the drafter than one in which the only possible result of the non-drafter bringing a claim is that they will lose over one thousand dollars. *See, e.g.*, *Glassford v. BrickKicker*, 35 A.3d 1044, 1047, 1049–50 (Vt. 2011) (holding unconscionable arbitration contract with damages limitation that "would have [the plaintiff] pay, at minimum, a $1350 arbitration fee to recover no more than the $285 inspection fee"); *Lhotka v. Geographic Expeditions, Inc.*, 104 Cal. Rptr.3d 844, 852 (Ct. App. 2010) (holding unconscionable limitation on recovery to cost of purchase, combined with out-of-state forum, because "any recovery plaintiffs

51

might obtain would be devoured by the expense they incur" and collecting similar cases); *cf. Vaks*, 2014 WL 861455 at *3 & n.5 (finding it "obvious"—and collecting cases agreeing—that a provision requiring a party to pay other side's attorneys' fees regardless of success is "unreasonably favorable" and, thus, unconscionable).

**2.** Unsatisfied with ensuring that consumers will always lose money in arbitration, Everlywell saddled its dispute resolution provisions with a host of additional one-sided terms. Everlywell subjects consumers, but not itself, to a shortened statute of limitations. JA79 (requiring that "[a]ny action, claim or dispute you," defined as the consumer, "have against us," defined as Everlywell, "must be filed within one year"). It requires consumers to go to Texas, Everlywell's home base, to arbitrate—regardless of where they live or bought their test. JA78. It bars consumers, but not itself, from recovering "consequential, incidental, indirect, exemplary, special or punitive damages." JA77. It limits consumers' direct damages, but not its own, to $100 or the price of the test. JA78. And it requires consumers to indemnify the company from any liability, including attorneys' fees and costs, "relating to" the consumer's "use" of Everlywell's site—in other words, Everlywell requires that consumers indemnify Everlywell from their own claims. *Id.* There is no similar provision requiring Everlywell to indemnify consumers.

In addition, Everlywell's dispute resolution provisions exclude from arbitration entirely the only claims Everlywell is ever likely to bring: those "related

to intellectual property rights." JA79. Because consumers pay Everlywell up front, JA75, the company is never going to need to sue a consumer for payment. The only claim the company is ever likely to have is an intellectual property claim. But it's difficult to imagine an intellectual property claim a consumer might have against Everlywell. And there is no similar carveout for claims a consumer is likely to bring. In case that wasn't enough, the company—as explained above—also gave itself a one-sided escape hatch: the right to unilaterally modify the contract.

This "multitude" of one-sided dispute resolution terms "demonstrate[s] a systematic effort to create a one-sided . . . forum," designed to unreasonably favor Everlywell at consumers' expense. *Nino*, 609 F.3d at 207. Indeed, there is "only one discernable purpose" of Everlywell's arbitration provisions—"to create advantages for [Everlywell] that are not afforded to" its customers. *Id.* Courts have repeatedly held that such one-sided dispute resolution schemes are substantively unconscionable. *See, e.g.*, *id.*; *Ferguson v. Countrywide Credit Indus., Inc.*, 298 F.3d 778, 787 (9th Cir. 2002) (holding arbitration contract unconscionable in light of "insidious pattern . . . to favor Countrywide at the expense of its employees"); *Cordova v. World Fin. Corp. of N.M.*, 208 P.3d 901, 910 (N.M. 2009) ("World Finance's self-serving arbitration scheme it imposed on its borrowers is so unfairly and unreasonably one-sided that it is substantively unconscionable."); *Burnett v. Pagliacci Pizza, Inc.*, 470 P.3d

53

486, 497 (Wash. 2020); *Tillman v. Com. Credit Loans, Inc.*, 655 S.E.2d 362, 372–73 (N.C. 2008); *Lhotka*, 104 Cal. Rptr.3d at 852.

## CONCLUSION

This Court should reverse the district court's order compelling arbitration.

Respectfully submitted,

*/s/ Jennifer D. Bennett*
JENNIFER D. BENNETT
GUPTA WESSLER LLP
505 Montgomery Street, Suite 625
San Francisco, CA 94111
(415) 573-0336
*jennifer@guptawessler.com*

MATTHEW W.H. WESSLER
ALISA TIWARI
GUPTA WESSLER LLP
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741

ANNA C. HAAC
GEMMA SEIDITA
KRISTEN G. SIMPLICIO
LEORA N. FRIEDMAN
TYCKO & ZAVAREEI LLP
2000 Pennsylvania Avenue NW,
Suite 1010
Washington, DC 20006
(202) 973-0900

ZACHARY ARBITMAN
ALAN M. FELDMAN
EDWARD S. GOLDIS

FELDMAN SHEPHERD
WOHLGELERNTER TANNER
WEINSTOCK & DODIG LLP
1845 Walnut Street, 21st Floor
Philadelphia, PA 19103
(215) 567-8300

December 28, 2023                    *Counsel for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 12,733 words excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

December 28, 2023                              */s/ Jennifer D. Bennett*
                                              Jennifer D. Bennett

## CERTIFICATE OF SERVICE

I hereby certify that on December 28, 2023, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the First Circuit by using the CM/ECF system. All participants are registered CM/ECF users, and will be served by the appellate CM/ECF system.

*/s/ Jennifer D. Bennett*
Jennifer D. Bennett

# Addendum

# TABLE OF CONTENTS

| Dkt. No. | Document | Date | Page |
|----------|----------|------|------|
| 40 | Order granting motion to compel arbitration | August 2, 2023 | Add. 1 |
| 41 | Order of dismissal | August 2, 2023 | Add. 3 |

| | |
|---|---|
| **From:** | ECFnotice@mad.uscourts.gov |
| **To:** | CourtCopy@mad.uscourts.gov |
| **Subject:** | Activity in Case 1:23-cv-11043-RGS Toth v. Everly Well, Inc. et al Order on Motion to Compel |
| **Date:** | Wednesday, August 2, 2023 4:07:56 PM |

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.

## United States District Court

## District of Massachusetts

## Notice of Electronic Filing

The following transaction was entered on 8/2/2023 at 4:06 PM EDT and filed on 8/2/2023
**Case Name:**     Toth v. Everly Well, Inc. et al
**Case Number:**    1:23-cv-11043-RGS
**Filer:**
**Document Number:** 40(No document attached)

**Docket Text:**
**Judge Richard G. Stearns: ELECTRONIC ORDER entered granting [29] Motion to Compel. The court will allow the motion to compel arbitration and will dismiss the case without prejudice for the reasons that follow.**

**Everlywell, as the party seeking to compel arbitration, bears the burden of showing that a valid, enforceable arbitration clause governs the claims asserted against it. *Ouadani v. TF Final Mile LLC*, 876 F.3d 31, 36 (1st Cir. 2017); *see also Air-Con, Inc. v. Daikin Applied Latin Am., LLC*, 21 F.4th 168, 175 (1st Cir. 2021) (noting that courts in this Circuit apply a summary judgment standard in evaluating the showing). To meet this burden, Everywell has offered evidence that Toth affirmatively checked a box accepting its Terms and Conditions, which included an arbitration clause, when she registered her Everlywell Food Sensitivity Test Kit. *See* Lusenhop Decl. [Dkt #39-3] paras. 5-7. Massachusetts courts have generally found such acts of positive acceptance sufficient to establish the existence of a valid contract to arbitrate. *See Kauders v. Uber Techs., Inc.*, 486 Mass. 557, 572 (2021). Toth seeks to depart from that precedent here. None of her argument, however, support a departure.**

**Toth's consideration argument hinges on Everlywell immediately becoming obligated to provide her with test results at the moment of purchase. But no reasonable consumer could expect purchase alone to guarantee the delivery of**

**Add. 1**

test results. Further action on the part of the consumer -- for example, collecting and submitting a blood sample -- is required before the Everlywell's performance becomes possible. And part of the process of completing the required further steps is the registration of the test kit. *See* Glasser Decl. [Dkt # 38], Ex. A (noting that Everlywell will not process a sample that has not been registered). In other words, until the registration is completed by the purchaser, there are no test results for Everlywell to withhold.

Toth's notice argument conflicts with the determination of the Massachusetts Supreme Judicial Court that "[r]equiring a user to expressly and affirmatively assent to the terms, such as by indicating 'I Agree' or its equivalent,.... puts the user on notice that the user is entering into a contractual arrangement." *Kauders*, 486 Mass. at 574; *see also Archer*, 490 Mass. at 361 ("Reasonable notice of a contract's terms exists even if the party did not actually view the agreement, so long as the party had an adequate opportunity to do so."). In any event, the court also finds it significant that, in addition to requiring an express manifestation of assent, the words "Terms and Conditions" are marked in green to signify the presence of a hyperlink and that no other text appears in that area to distract a user from the import of the words.

Toth's acceptance argument assumes that she had no meaningful choice or opportunity to reject the Terms and Conditions. But the Terms and Conditions explicitly state that users are free to turn down the terms of registration and receive a refund, *see* Lusenhop Decl., Ex. A, at 3, as do portions of the company's website, *see* Peaslee Decl. [Dkt # 29-4], Ex. G; Lusenhop Decl. paras. 14-15. In any event, because Toth made her purchase through Target's website, *see* Compl. paras. 9, 83; Toth Decl. [Dkt # 37] para. 2, and the relevant Target item webpage expressly authorized returns for up to 90 days after purchase, *see* Peaslee Decl., Ex. G; *see also* Haac Decl. [Dkt # 36], Ex. A at 1 (indicating that an item webpage may modify the general return policy), Toth had a reasonable and available alternative to simply accepting the terms.

Toth's argument that her privacy claims do not fall within the scope of the arbitration provision is an issue for the arbitrator to address. *See* Lusenhop Decl., Ex. A at 6 ("[T]he arbitrator shall have sole authority to decide whether claims brought by either party... are subject to this dispute resolution agreement."); *see also Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524, 529 (2019) ("[W]e have held that parties may agree to have an arbitrator decide not only the merits of a particular dispute but also gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.") (internal quotation marks and citations omitted). The same is true of her argument that the clause does not cover her claims because it does not apply retroactively.

Finally, Toth's procedural unconscionability arguments merely recycle under a new label her same previously rejected arguments. They fail for the same reasons. (RGS, law3)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Joyce Toth

      Plaintiff

    v.                                                    Civil Action No. 1:23-11043-RGS

Everly Well, Inc. et al

      Defendants

ORDER OF DISMISSAL

August 2, 2023

STEARNS, D.J.

In accordance with the court's Electronic Order [Dkt. # 40] entered on August 2, 2023, it is ORDERED that the above-entitled action be, and hereby is, dismissed without prejudice.

By the court,

/s/ Arnold Pacho
Deputy Clerk

**Add. 3**